Elaine A. Ryan (AZ Bar #012870)
Carrie A. Laliberte (AZ Bar #032556)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:     (602) 274-1100
Email:            eryan@bffb.com
                     claliberte@bffb.com

Patricia N. Syverson (AZ Bar #020191)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:     (619) 798-4593
Email:            psyverson@bffb.com

*As local counsel on behalf of:*

John A. Yanchunis (*To Be Admitted Pro Hac Vice*)
Patrick A. Barthle (*To Be Admitted Pro Hac Vice*)
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone:     (813) 223-5505
Email:            jyanchunis@forthepeople.com
                     pbarthle@forthepeople.com

Counsel for Plaintiff and the Putative Class
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| CAROL DEARING, on behalf of herself and all others similarly situated, | **Case No.:** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| MAGELLAN HEALTH INC. AND MAGELLAN RX MANAGEMENT, LLC, | |
| Defendants. | |

Plaintiff Carol Dearing, by and through her undersigned counsel, brings this class action lawsuit against Magellan Health Inc. ("Magellan Health") and Magellan Rx Management, LLC ("Magellan Rx") (and together, "Magellan" or "Defendants"), on behalf of herself and all others similarly situated, and alleges, based upon information and belief and the investigation of her counsel as follows:

## INTRODUCTION

1.     Magellan is a large healthcare service provider that, among other things, directly manages pharmaceutical benefits for their members' patients, including those participating in state-sponsored Medicaid programs such as TennCare of Tennessee of which Plaintiff is a member.[1]

2.      As part of its contractual relationship with TennCare and several other providers, Magellan administers the pharmaceutical benefits under the state-sponsored Medicaid plan throughout the applicable state.  As a result of Plaintiff's participation in TennCare, Magellan received fees from TennCare and/or the state  of Tennessee to administer those benefits and to provide services related to those benefits to Plaintiff and other TennCare beneficiaries, which included storing the personal data of Plaintiff and others on their computers and computer systems.

3.     On or about November 8, 2019, Magellan notified affected patients that an employee, who manages member data for various health plans, fell for a phishing scheme that compromised his/her email and resulted in exposure of the personally identifiable information ("PII") and protected health information ("PHI") (collectively, "PII") of tens of thousands of individuals, including Plaintiff and 44,000 other TennCare participants (the

---

[1] TennCare is the State of Tennessee's Medicaid program that provides health care for approximately 1.4 million Tennesseans consisting primarily of low-income pregnant women, children, and individuals who are elderly or have a disability. TennCare covers approximately 20 percent of the state's population, 50 percent of the state's births, and 50 percent of the state's children. https://www.tn.gov/tenncare/information-statistics/tenncare-overview.html (last visited April 13, 2020).

"Data Breach").   The exposed PHI and PII included names, Social Security Numbers, member IDs, health plans, provider names, and the names of the drugs that members have been prescribed.

4.     On July 5, 2019, Magellan discovered the Data Breach, which occurred on May 28, 2019. A subsequent investigation revealed that at least one other employee's email account had also been accessed by an unauthorized third party as part of the Data Breach.

5.     Despite having known about the Data Breach since early July, Magellan inexplicably delayed more than four months before it alerted the affected patients that their PII had been unlawfully exposed.

6.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patient PII.

7.     Defendants disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard patient PHI and PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiff and Class Members with prompt and accurate notice of the Data Breach.

8.     As a result of Defendants' failure to implement and follow basic security procedures, patient PHI and PII is now in the hands of thieves. Plaintiff and Class Members have had to spend, and will continue to spend, significant amounts of time and money in an effort to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and fraud.

9.     Plaintiff, on behalf of all others similarly situated, alleges claims for negligence, negligence per se, breach of implied contract, unjust enrichment, , and

violations of the Arizona Consumer Fraud Act, and seeks injunctive and declaratory relief to, *inter alia*, compel Defendants to adopt reasonably sufficient security practices to safeguard patient PHI and PII that remains in their custody in order to prevent incidents like the Data Breach from reoccurring in the future.

### PARTIES

10.     Plaintiff Carol Dearing, a resident of Sparta, Tennessee, is a TennCare participant and obtained her prescriptions through Magellan Rx. On or about November 8, 2019, Ms. Dearing was sent a notice from Magellan Rx of a Data Breach that involved her highly sensitive PHI and PII, including her name, Social Security Number, health plan ID number, health plan name, provider name, and drug names (the "Notice").[2]

11.     Defendant Magellan Health is a publicly traded Delaware corporation headquartered at 4801 E. Washington Street, Phoenix, Arizona 85034. It is a Fortune 500 company broadly operating in the healthcare management business.

12.     Defendant Magellan Rx is a division of Magellan Health that provides, among other things, clinical and financial management of pharmaceuticals paid under medical and pharmacy benefit programs. Specifically, Magellan Rx offers pharmacy benefit management services, pharmacy benefit administration for state Medicaid and other government sponsored programs; pharmaceutical dispensing operations; clinical and formulary management programs; medical pharmacy management programs; and programs for the management of specialty drugs that treat complex conditions. The company provides services to health plans and other managed care organizations, employers, labor unions, various military and governmental agencies, and third-party administrators.

13.     According to filings with the Arizona Corporation Commission, Magellan Rx is incorporated in the state of Delaware.  Its CEO, however, Mostafa Kamal is located

---

[2] A true and copy of the Notice is attached hereto as Exhibit A.  The Notice appears to have been sent from ID Experts, a third party identity theft and protection service company, of Everett, Washington on behalf of Magellan Rx and was signed by John J. DiBernardi, Jr., the Senior Vice President and Chief Compliance Officer for Magellan Health.

1    at the company's corporate office in Scottsdale, Arizona where Magellan Rx maintains its

2    principal place of business.

3         14.    Magellan Rx operates through a website portal, where it interacts directly

4    with members of the programs it offers.[3] It provides patients such as Plaintiff and Class

5    Members with pharmacy benefit cards that they must use to obtain medications. Moreover,

6    patients are provided telephone numbers that are answered by Magellan and are to be used

7    in the event they have questions or issues with their prescriptions.

8                              **JURISDICTION AND VENUE**

9         15.    This Court has subject matter jurisdiction over this action under the Class

10   Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million,

11   exclusive of interest and costs. There are at least 44,000 putative Class Members, most of

12   whom have different citizenship from Magellan.

13        16.    This Court has jurisdiction over Defendants, which operate and are

14   headquartered in this District. The computer systems implicated in this Data Breach are

15   likely based in this District. Through their business operations in this District, Magellan

16   intentionally avails themselves of the markets within this District to render the exercise of

17   jurisdiction by this Court just and proper.

18        17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a

19   substantial part of the events and omissions giving rise to this action occurred in this District.

20   Defendants are based in this District, maintain patient PHI and PII in the District, and have

21   caused harm to Plaintiff and Class Members through their actions in this District.

22                              **STATEMENT OF FACTS**

23   ***A.  The Data Breach***

24        18.    On July 5, 2019, Magellan learned that an unauthorized third party gained

25   access to an employee email account through a commonplace phishing attack which

26

27   _____

28   [3] https://www1.magellanrx.com/ (last visited April 13, 2020).

Case 2:20-cv-00747-SPL   Document 1   Filed 04/17/20   Page 6 of 41

occurred on May 28, 2019 and resulted in the exposure of sensitive patient PHI and PII. The exposed sensitive PHI and PII included patient: names, Social Security Numbers, health plan member ID numbers, health plan names, provider information, and prescription drug names.

19.     Despite the Data Breach occurring on May 28, 2019, Magellan did not learn of the breach until July 5, 2019 – over a month later.  Magellan did not have sufficient security measures in place to promptly detect much less prevent the Breach.

20.     And, despite having become aware of the Data Breach in July 2019, Magellan waited more than 4 months to notify affected patients.

21.     The notice sent by Magellan to Plaintiff and Class Members stated, in relevant part:

November 8, 2019

Re:   Notice of Possible Data Breach

Magellan Rx Management, a subsidiary of Magellan Health, Inc. ("Magellan"), manages the pharmacy benefits for TennCare and its members. We review health care services to make sure they are medically necessary and should be paid.

This letter is to let you know that some information about you may have been put at risk.

**What Happened**

On July 5, 2019, Magellan learned that one of our employee's email accounts had been hacked by an unknown third-party ("hacker") on May 28, 2019. Our information security team immediately took steps to lockdown this employee's account and make sure no others could access it. We also immediately undertook an investigation to find out if any other email accounts were hacked. We believe that the hacker was trying to access our employee's email account to send out spam. Spam is unwanted email from unknown people. We also believe he or she had no plan to view, read or do anything with the emails. We cannot say for sure that no emails were seen. While we have no proof that the hacker saw any emails, we are being extra careful. We want you to know that your information was in at least one email.

**What Information Was Involved**

We understand you may be worried about this. The emails that may have been seen had information such as:

- Your name
- Your Social Security number
- Your health plan member ID number
- The name of your health plan
- Your provider
- Drug name

**What You Can Do**

While we do not know of any attempt by the hacker to access or use your personal information, we are offering you services through ID Experts®, the data breach and recovery services expert, to provide you with MyIDcare™. MyIDCare services include: 12 months of Credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, MyIDCare will help you resolve issues if your identity is compromised.[4]

22.    While 44,000 TennCare patients were among the first to get notice, Magellan subsequently revealed that the Data Breach extended to patients of other providers across the United States as well:

**Important Health Plan Announcement**

**Important announcement for Health Plan members receiving pharmacy services managed by Magellan Rx Management:**

On July 5, 2019 Magellan Health's subsidiary, Magellan Rx Management, discovered a potential data breach related to protected health information of the following health plans:

- Posted on 11/13/19 – Florida Blue
- Posted on 11/18/19 – Independent Health
- Posted on 11/22/19 – Emblem
- Posted on 11/27/19 – Alliant Health Plans

---

[4] *See* Exhibit A.

1

2

- Posted on 11/27/19 – ConnectiCare Inc

- Posted on 11/27/19 – Horizon BCBS NJ

3

4

5

6

7

We found that an anonymous, unauthorized third party accessed the email accounts of an employee who handles member data for various health plans. The unauthorized access occurred on May 28, 2019. We immediately secured the employee's email account and conducted a thorough investigation of all employee email accounts and all other Magellan systems. We believe that the impacted employee may have been the target of a phishing scam and that the purpose of the unauthorized access to the email account was to send out email spam.

8

9

10

11

12

As a result of the hacking incident, member protected health information may potentially have been accessed. The affected email account contained protected health information that included health benefits information, which may have included member name, date of birth, member address, member ID, provider name, authorization determination and/or number, claim number, date(s) of service, drug name, billing codes, or benefit descriptions such as diagnosis or procedure. The employee's email account also included the Social Security Numbers (SSN) of members of some health plans. [5]

13

### B. Magellan's Privacy Policies

14

15

16

17

18

23.     As healthcare service providers, Defendants are bound by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which requires subject providers to comply with a series of administrative, physical security, and technical security requirements in order to protect patient information. Among other things, it mandates medical providers develop, publish, and adhere to a privacy practice.

19

20

21

22

24.     Magellan recognizes their obligations under HIPAA along with the commensurate obligation to safeguard and protect patient PHI and PII, assuring users that "[y]our personal privacy is important to us."[6]  Magellan Health's Privacy Policy further states:

23

24

25

**Security**

A range of security features protect the privacy of any individualized information you provide over a secure sign-in to the Magellan website. During transmission

26

27

28

[5] https://www1.magellanrx.com/home/2516-2/ (last visited April 13, 2020).
[6] https://www1.magellanrx.com/privacy-policy/ (last visited April 13, 2020).

over a secure sign-in website, your privacy is protected by 128-bit or greater cryptographic security. Other security safeguards are also in place.

Magellan uses physical, technical, and administrative safeguards to protect any personally identifiable data stored on its computers. Only authorized employees and third parties have access to the information you provide to Magellan for providing service to you.

**HIPAA**

HIPAA is the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

HIPAA outlines strict guidelines to ensure the privacy and confidentiality of your Personal Health Information (PHI) such as your name or medical information. These guidelines require that your PHI be used for purposes of treatment, payment and health plan operations, and not for purposes unrelated to health care. [7]

### C. Prevalence of Cyber Attacks and Susceptibility of the Healthcare Sector

25.     Cyber-attacks come in many forms. Phishing attacks are among the oldest, most common, and well known.  In simple terms, phishing is a method of obtaining personal information using deceptive e-mails and websites. The goal is to trick an e-mail recipient into believing that the message is something they want or need from a legitimate or trustworthy source and to subsequently take an action such as clicking on a link or downloading an attachment. The fake link will typically mimic a familiar website and require the input of credentials. Once input, the credentials are then used to gain unauthorized access into a system.  "It's one of the oldest types of cyber-attacks, dating back to the 1990s" and one that every organization with an internet presence is aware."[8] It remains the "simplest kind of cyberattack and, at the same time, the most dangerous and effective."[9]

---

[7] *See, e.g.*, https://www.magellanhealth.com/privacy-policy/ (last visited April 13, 2020).

[8] What is phishing? How this cyber attack works and how to prevent it, CSO Online, February 20, 2020, https://www.csoonline.com/article/2117843/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html (last visited April 13, 2020).

[9] *Phishing*, Malwarebytes, https://www.malwarebytes.com/phishing/ (last visited April 13, 2020).

26.     Phishing attacks are well known and understood by the cyber-protection community and are generally preventable with the implementation of a variety of proactive measures such as sandboxing inbound e-mail[10], inspecting and analyzing web traffic, penetration testing[11], and employee education, among others.

27.     In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a 40% increase in the number of data breaches from the previous year.[12]  In 2017, a new record high of 1,579 breaches were reported, representing a 44.7% increase over 2016.[13]

28.     In 2018, the healthcare sector reported the second largest number of breaches among all measured sectors and the highest rate of exposure per breach.[14] Indeed, healthcare related data is among the most sensitive and personally consequential when compromised. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for health care they did not receive in order to restore

---

[10] Sandboxing is an automated process whereby e-mail with attachments and links are segregated to an isolated test environment, or a "sandbox," wherein a suspicious file or URL may be executed safely.

[11] Penetration testing is the practice of testing a computer system, network, or web application to find security vulnerabilities that an attacker could exploit. The main objective of penetration testing is to identify security weaknesses. Penetration testing can also be used to test an organization's security policy, its adherence to compliance requirements, its employees' security awareness and the organization's ability to identify and respond to security incident. The primary goal of a penetration test is to identify weak spots in an organization's security posture, as well as measure the compliance of its security policy, test the staff's awareness of security issues and determine whether -- and how -- the organization would be subject to security disasters. *See* https://searchsecurity.techtarget.com/definition/penetration-testing (last visited April 13, 2020).

[12] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys (last visited April 13, 2020).

[13] Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, *available at* https://www.idtheftcenter.org/2017-data-breaches/ (last visited April 13, 2020).

[14] Identity Theft Resource Center, 2018 End -of-Year Data Breach Report, *available at* https://www.idtheftcenter.org/2018-data-breaches/ (last visited April 13, 2020).

coverage.[15]  Almost 50% of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[16]

29.    Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[17] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From Social Security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[18]

30.    Indeed, the HIPAA Journal 2019 Healthcare Data Breach Report demonstrates an upward trend in health sector data breaches over the past 10 years, with 2019 reflecting more data breaches than any other year.[19] 2019 represented a 37.4% increase

---

[15] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010, https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited April 13, 2020).
[16] *Id.*
[17] HIMSS, 2019 HIMSS Cybersecurity Survey, https://www.himss.org/himss-cybersecurity-survey (last visited April 13, 2020).
[18] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at* https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited April 13, 2020).
[19] HIPAA Journal, Healthcare Data Breach Statistics, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited April 13, 2020).

over breaches reported in 2018 with a total number of patient records exposed increasing from 13,947,909 in 2018 to 41,335,889.[20]

31.    "Shockingly, the report disclosed that in 2019 alone, the healthcare records of 12.55% of the population of the United States were exposed, impermissibly disclosed, or stolen."[21]

32.    As healthcare services providers, Magellan knew, or should have known, the importance of safeguarding patient PHI and PII entrusted to them and of the foreseeable consequences if their data security systems were breached, including the significant costs that would be imposed on their patients as a result of a breach.  But Magellan failed to take adequate cyber-security measures to prevent the Data Breach from occurring.

**D.  Magellan Acquires, Collects, and Stores Plaintiff's and Class Members' PHI and PII**

33.    Magellan acquires, collects, and stores a massive amount of protected health related information and other personally identifiable data on their members' patients.

34.    As a condition of engaging in health services, Magellan requires that these patients entrust them with highly sensitive personal information.

35.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PHI and PII, Magellan assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PHI and PII from unauthorized disclosure.

36.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PHI and PII. Plaintiff and Class Members relied on Magellan to keep

---

[20]    *2019    Healthcare    Data    Breach    Report*,    HIPAA    Journal, https://www.hipaajournal.com/2019-healthcare-data-breach-report/ (last visited April 13, 2020).

[21] *Report Reveals Worst State for Healthcare Data Breaches in 2019*, Info Security Group, February 14, 2020, https://www.infosecurity-magazine.com/news/report-healthcare-data-breaches-in/ (last visited April 13, 2020).

their PHI and PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### E. The Value of Personally Identifiable Information and the Effects of Unauthorized Disclosure

37.     Magellan was well-aware that the PHI and PII they collect is highly sensitive, and of significant value to those who would use it for wrongful purposes.

38.     Personal identifiable information is a valuable commodity to identity thieves. As the FTC recognizes, with identity thieves can commit an array of crimes including identify theft, medical and financial fraud.[22] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

39.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute. This is because one's personal health history (*e.g.*, ailments, diagnosis, surgeries, etc.) cannot be changed.[23] PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

40.     The ramifications of Magellan's failure to keep their patients' PII secure are long lasting and severe.  Once PHI and PII is stolen, fraudulent use of that information and damage to victims may continue for years.

41.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security Number to apply for additional credit lines.

---

[22] Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited April 13, 2020).

[23] Center for Internet Security, Data Breaches: In the Healthcare Sector, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited April 13, 2020).

Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

42.      Moreover, it is not an easy task to change or cancel a stolen Social Security Number. An individual cannot obtain a new Social Security Number without significant paperwork and evidence of actual misuse. Even then, a new Social Security Number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

43.      This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[25]  As explained above, the inclusion of PHI, such as the information exposed here, is even more valuable.

44.      At all relevant times, Magellan knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if their data security

---

[24] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited April 23, 2020).

[25] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited April 23, 2020).

systems were breached, including, the significant costs that would be imposed on patients as a result of a breach.

**F. Magellan's Conduct Violates HIPAA and Evidences Their Insufficient Data Security**

45.     HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information   entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[26]

46.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendants left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

47.     Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate they failed to comply with safeguards mandated by HIPAA regulations. Magellan's security failures include, but are not limited to:

    a.  Failing to ensure the confidentiality and integrity of electronic protected health information that Defendants create, receive, maintain, and transmit, in violation of 45 C.F.R. § 164.306(a)(1);

    b.  Failing to implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software

---

[26] *What is Considered Protected Health Information Under HIPAA*?, HIPAA Journal, April 22, 2018, https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last visited April 23, 2020).

programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

c.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

d.   Failing to identify and respond to suspected or known security incidents and to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

e.   Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronically protected health information, in violation of 45 C.F.R. § 164.306(a)(2);

f.   Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

g.   Failing to ensure compliance with HIPAA security standard rules by their workforce, in violation of 45 C.F.R. § 164.306(a)(94);

h.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. §§ 164.502, *et seq.*;

i.   Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

j.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in violation of 45 C.F.R. § 164.530(c).

### G. Magellan Failed to Comply with FTC Guidelines, Further Evidencing Their Insufficient Data Security

48.   The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[27]

49.   In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses.[28] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

50.   The FTC further recommends that companies not maintain PHI and PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[29]

---

[27] Federal Trade Commission, *Start With Security*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited April 23, 2020).

[28] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited April 23, 2020).

[29] FTC, *Start With Security*, *supra* note 27.

51.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.    Magellan failed to properly implement basic data security practices. Magellan's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PHI and PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

53.    Magellan was at all times fully aware of their obligation to protect the PHI and PII of patients because of their position as a trusted healthcare provider. Magellan was also aware of the significant repercussions that would result from their failure to do so.

### H. Magellan Failed to Comply with Industry Standards

54.    Data exfiltrated from healthcare providers continues to be a high value target among cybercriminals.  In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[30] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[31] As a result, both the government and private sector have developed industry best standards to address this growing problem.

55.    The Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that "[w]hile all organizations need to implement policies, procedures, and

---

[30] https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; Identity Theft Resource Center, 2018 End of Year Data Brach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited April 23, 2020).
[31] Id.

technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data." [32] DHHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience which require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of PHI and PII; (b) educating and training healthcare employees on how to protect PHI and PII; and (c) correcting the configuration of software and network devices.

56.     Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because of the value of the PHI and PII they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats. [33] They too have promulgated similar best practices for bolstering cyber security and protecting against the unauthorized disclosure of PHI and PII.

57.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Magellan chose to ignore them. These best practices were known, or should have been known by Magellan, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of PHI and PII.

### I.   *Plaintiff and Class Members Suffered Damages*

58.     The ramifications of Defendants' failure to keep Patients' PHI and PII secure are long lasting and severe.  Once PHI and  PII is stolen, fraudulent use of that information

---

[32] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA Journal, November 1,    2018,    https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last visited April 23, 2020).
[33]    *See,    e.g.,*    https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry;    https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last visited April 23, 2020).

and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[34]

59.    The PII belonging to Plaintiff and Class Members is private, sensitive in nature, and was left inadequately protected by Defendants, who did not obtain Plaintiff's or Class Members' consent to disclose such PHI and PII to any other person as required by applicable law and industry standards.

60.    Upon receiving the Notice, Ms. Dearing immediately contacted all three credit bureaus in order to put freezes on her credit. She also contacted two credit card companies with whom she transacts to notify them of the breach, one of which issued her a new card.

61.    Since the announcement of the Data Breach, Ms. Dearing continues to monitor her accounts in an effort to detect and prevent any misuses of her personal information.

62.    Ms. Dearing has spent and continues to spend her valuable time to protect the integrity of her medical information, finances, and credit—time which she would not have had to expend but for the Data Breach.

63.    Ms. Dearing suffered actual injury from having her PHI and PII exposed as a result of the Data Breach, including, but not limited to: (a) conferring and/or causing to be conferred monies to Magellan that would not have been paid to Magellan had Magellan disclosed that they lacked data security practices adequate to safeguard consumers' PHI and PII from theft; (b) damages to and diminution in the value of her PHI and PII—a form of intangible property that the Plaintiff entrusted to Magellan as a condition for health related services; (c) imminent and impending injury arising from the increased risk of fraud and identity theft.; and (d) the time and money she spent monitoring her accounts, contacting

---

[34] 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last visited April 23, 2020).

credit bureaus and credit card companies, and otherwise attempting to protect her information.

64.    As a result of the Data Breach, Ms. Dearing will continue to be at heightened risk for financial fraud, medical fraud, identity theft, and their attendant damages for years to come.

65.    The Data Breach was a direct and proximate result of Magellan's failure to: (a) properly safeguard and protect Plaintiff's and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

66.    Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite their obligations to protect patient.

67.    As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[35]

---

[35] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited April 13, 2019).

68.     To date, Magellan has offered only a year of identity monitoring services to a subset of affected patients.  This is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud and it entirely fails to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

69.     As a result of the Defendants' failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, or are at increased risk of suffering:

      a.   The compromise, publication, theft, and/or unauthorized use of their PII;

      b.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

      c.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

      d.   The continued risk to their PHI and PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the PHI and PII in their possession; and

      e.   Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

70.     In addition to a remedy for the economic harm, Plaintiff and the Class maintain an undeniable interest in ensuring that their PHI and PII is secure, remains secure, and is not subject to further misappropriation and theft.

### J. Defendants' Delay in Identifying and Reporting the Data Breach Caused Additional Harm

71.     It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[36]

72.     Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[37]

73.     Although their PII was improperly exposed in May 2019, Defendants did not discover the Data Breach until July, and affected patients were not notified of the Data Breach until November, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

---

[36] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million  (last visited April 23, 2020).

[37] *The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too*, Consumer Reports, January 31, 2019, https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last visited April 23, 2020).

74.     As a result of Magellan's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff seeks relief on behalf of herself and as a representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a Nationwide class defined as follows:

> All persons whose PII was compromised as a result of the Data Breach announced by Magellan on or about November 7, 2019 (the "Class").

76.     Excluded from the Class are Magellan and any of their affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

77.      Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

78.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

79.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous that the joinder of all members is impractical.  The Data Breach implicates more than 44,000 Magellan pharmaceutical plan participants.

80.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

   a.   Whether Magellan had a duty to protect patient PHI and  PII;

   b.   Whether Magellan knew or should have known of the susceptibility of their systems to a data breach;

c.   Whether Magellan's security measures to protect their systems were reasonable in light of best practices recommended by data security experts;

d.   Whether Magellan was negligent in failing to implement reasonable and adequate security procedures and practices;

e.   Whether Magellan's failure to implement adequate data security measures allowed the breach of their data systems to occur;

f.   Whether Magellan's conduct, including their failure to act, resulted in or was the proximate cause of the breach of their systems, resulting in the unlawful exposure of the Plaintiff' and Class Members' PHI and PII;

g.   Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Magellan's failure to reasonably protect their systems and data network; and,

h.   Whether Plaintiff and Class members are entitled to relief.

81.   **Typicality. Fed. R. Civ. P. 23(a)(3).**   Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class Members.  Plaintiff was a Magellan member patient whose PII was exposed in the Data Breach. Plaintiff's damages and injuries are akin to other Class Members, and Plaintiff seeks relief consistent with the relief sought by the Class.

82.   **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class she seeks to represent; is committed to pursuing this matter against Magellan to obtain relief for the Class; and has no conflicts of interest with the Class. Moreover, Plaintiff's Counsel are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

83.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Magellan, and thus, individual litigation to redress Magellan's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

84.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

85.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

        a.   Whether Magellan failed to timely notify the public of the Data Breach;

        b.   Whether Magellan owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PHI and PII;

c.  Whether Magellan's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendants failed to take commercially reasonable steps to safeguard patient PHI and PII;

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have

g.  reasonably prevented the data breach; and

h.  Whether Magellan failed to comply with their obligations under HIPAA.

86.  Finally, all members of the proposed Class are readily ascertainable. Magellan has access to patient names and addresses affected by the Data Breach. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

87.  Plaintiff restates and realleges the paragraphs 1 through 86 as if fully set forth herein.

88.  As a condition of receiving services, Plaintiff and Class Members were obligated to provide Magellan directly, or through their respective insurance providers, with their PHI and PII.

89.  Plaintiff and the Class Members entrusted their PHI and PII to Magellan with the understanding that Magellan would safeguard their information.

90.  Defendants had full knowledge of the sensitivity of the PHI and PII and the types of harm that Plaintiff and Class Members could and would suffer if the PHI and PII were wrongfully disclosed.

91.     Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining, and testing the Defendants' security protocols to ensure that PHI and PII in their possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of such information.

92.     Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing the PHI and PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, the current cyber scams being perpetrated, and that they had inadequate employee training and education and IT security protocols in place to secure the PHI and PII of Plaintiff and the Class.

93.     Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and encrypted authorized disclosure of the PHI and PII of Plaintiff and Class Members.

94.     Plaintiff and the Class Members had no ability to protect their PHI and PII that was in Magellan's possession.

95.     Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

96.     Defendants had a duty to put proper procedures in place in order to prevent the unauthorized dissemination of Plaintiff's and Class Members' PHI and PII.

97.     Defendants admitted that Plaintiff's and Class Members' PII was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

98.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding the Plaintiff's and Class Members' PHI and PII while it was within the Magellan's possession or control.

99.     Defendants improperly and inadequately safeguarded Plaintiff's and Class Members' PHI and PII in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

100.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of their patients' PHI and PII.

101.     Defendants, through their actions and/or omissions, unlawfully breached their duty to timely and adequately disclose to Plaintiff and Class Members the existence, and scope of the Data Breach.

102.     But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class Members, Plaintiff's and Class Members' PHI and PII would not have been compromised.

103.     There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

104.     As a result of Defendants' negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

//

## SECOND CAUSE OF ACTION
### NEGLIGENCE PER SE

105.     Plaintiff restates and realleges paragraphs 1 through 86 as if fully set forth herein.

106.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Magellan, of failing to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

107.     Magellan violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII and not complying with applicable industry standards, as described in detail herein. Magellan's conduct was particularly unreasonable given the nature and amount of PII they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

108.     Magellan's violation of Section 5 of the FTC Act constitutes negligence per se.

109.     Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

110.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

111.     As a direct and proximate result of Magellan's negligence per se, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing

"freezes" and "alerts" with credit reporting agencies; contacting their financial institutions; closing or modifying financial and medical accounts; closely reviewing and monitoring their credit reports and various accounts for unauthorized activity and filing police reports; and damages from identity theft, which may take months if not years to discover and detect.

112.    Additionally, as a direct and proximate result of Magellan's negligence per se, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Magellan's possession and is subject to further unauthorized disclosures so long as Magellan fails to undertake appropriate and adequate measures to protect the PII in their continued possession.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT

113.    Plaintiff restates and realleges paragraphs 1 through 86 as if fully set forth herein.

114.    Plaintiff and Class Members were required to provide their PII, including their names, Social Security numbers, addresses, medical record numbers, dates of birth, telephone numbers, email addresses, and various health related information to Defendants as a condition of their use of Defendants' services.

115.    Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services, along with Defendants' promise to protect their health information and other PII from unauthorized disclosure.

116.    In their written privacy policies, Magellan expressly promised Plaintiff and Class Members that they would only disclose PHI and other PII under certain circumstances, none of which relate to the Data Breach.

117.    Magellan promised to comply with HIPAA standards and to make sure that Plaintiff's and Class Members' PHI and other PII would remain protected.

118.    Implicit in the agreement between Plaintiff and Class Members and the Defendants to provide PHI and other PII, was the latter's obligation to: (a) use such PHI and PII for business purposes only; (b) take reasonable steps to safeguard that PHI and PII; (c)

31

prevent unauthorized disclosures of the PHI and PII; (d)  provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PHI and PII; (e) reasonably safeguard and protect the PHI and PII of Plaintiff and Class Members from unauthorized disclosure or uses; and (f) retain the PHI and PII only under conditions that kept such information secure and confidential.

119.    Without such implied contracts, Plaintiff and Class Members would not have provided their PHI and PII to Defendants.

120.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendants, however, Defendants did not.

121.    Defendants breached the implied contracts with Plaintiff and Class Members by failing to, *inter alia*:

      a.  Reasonably safeguard and protect Plaintiff's and Class Members' PHI and PII, which was compromised as a result of the Data Breach;

      b.  Comply with their promise to abide by HIPAA;

      c.  Ensure the confidentiality and integrity of electronic protected health information Defendants created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

      d.  Implement technical policies and procedures for electronic information systems that maintain electronically PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

      e.  Implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

      f.  Identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii); and

g.  Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2).

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT

122.    Plaintiff restates and realleges paragraphs 1 through 86 as if fully set forth herein.

123.    Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased goods and services from Defendants and, in so doing, provided Defendants with their PHI and PII. In exchange, Plaintiff and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their PHI and PII protected with adequate data security.

124.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PHI and PII of Plaintiff and Class Members for business purposes.

125.    The amounts Plaintiff and Class Members paid for goods and services were used, in part, to pay for use of Defendants' network and the administrative costs of data management and security.

126.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

127.    Defendants failed to secure Plaintiff's and Class Members' PHI and PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

128.    Defendants acquired the PHI and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

129.    If Plaintiff and Class Members knew that Defendants had not secured their PHI and PII, they would not have agreed to Defendants' services.

130.    Plaintiff and Class Members have no adequate remedy at law.

131.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PHI and PII is used; (iii) the compromise, publication, and/or theft of their PHI and PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PHI and PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PHI and PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect PHI and PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PHI and PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

132.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

133.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

//

//

//

**FIFTH CAUSE OF ACTION**
**ARIZONA CONSUMER FRAUD ACT ("ACFA")**
**Ariz. Rev. Stat. §§ 44-1521, *et seq*.**

134.   Plaintiff restates and realleges paragraphs 1 through 86 as if fully set forth herein.

135.   The ACFA provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in face been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*Id.* § 44-1522.

136.   Plaintiff and Class Members are "persons" as defined by Ariz. Rev. Stat. § 44-1521(6), Magellan provides "services" as that term is included in the definition of "merchandise" under Ariz. Rev. Stat. § 44-1521(5), and Magellan is engaged in the "sale" of "merchandise" as defined by Ariz. Rev. Stat. § 44-1521(7).

137.   Magellan engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA, including but not limited to the following:

   a.   Failing to maintain sufficient security to keep Plaintiff's and Class Members' confidential medical, financial and personal data from being hacked and stolen;

   b.   Failing to disclose the Data Breach to Class Members in a timely and accurate manner, in violation of Ariz. Rev. Stat. § 18-552(B);

   c.   Misrepresenting material facts, pertaining to the sale of health benefit services by representing that they would maintain adequate data

privacy and security practices and procedures to safeguard Class Members' PHI and PII from unauthorized disclosure, release, data breaches, and theft;

d.   Misrepresenting material facts, in connection with the sale of health benefit services by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Class Members' PHI and PII;

e.   Omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Class Members' PHI and PII;

f.   Engaging in unfair, unlawful, and deceptive acts and practices with respect to the sale of health benefit services by failing to maintain the privacy and security of Class Members' PHI and PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Magellan Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws;

g.   Engaging in unlawful, unfair, and deceptive acts and practices with respect to the sale of health benefit services by failing to disclose the Magellan Data Breach to Class Members in a timely and accurate manner;

h.   Engaging in unlawful, unfair, and deceptive acts and practices with respect to the sale of health benefit services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Class Members' PHI and PII from further unauthorized disclosure, release, data breaches, and theft.

138.    The above unlawful, unfair, and deceptive acts and practices by Magellan were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

139.    Magellan knew or should have known that their computer systems and data security practices were inadequate to safeguard Class Members' PHI and PII and that risk of a data breach or theft was high. Magellan's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Members of the Class.

140.    As a direct and proximate result of Magellan's deceptive acts and practices, the Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their PHI and PII.

141.    Plaintiff and Class Members seek relief under the ACFA including, but not limited to, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**INJUNCTIVE AND DECLARATORY RELIEF**

142.    Plaintiff restates and realleges paragraphs 1 through 86 as if fully set forth herein

143.    Plaintiffs seek a declaration that: (i) Magellan's existing data security measures do not comply with its contractual obligations and duties of care; and (ii) in order to comply with its contractual obligations and duties of care, Magellan must implement and maintain reasonable security measures, including, but not limited to:

    a.    Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests and audits on Magellan's systems on a

periodic basis, and ordering Magellan to promptly correct any problems or issues detected by such third-party security auditors;

b.   Engaging third-party security auditors and internal personnel to run automated security monitoring;

c.   Auditing, testing and training their security personnel regarding any new or modified procedures;

d. Segmenting customer data by, among other things, creating firewalls and access controls so that if one area of Magellan is compromised, hackers cannot gain access to other portions of Magellan's systems;

e. Purging, deleting and destroying PII and PHI not necessary for its provisions of services in a reasonably secure manner;

f. Conducting regular database scans and security checks;

g. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h. Educating its members and their beneficiaries about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they should take to protect themselves.

144.   As a direct result of Magellan's knowing violations of HIPAA, the FTCA and industry standards, Class Members are entitled to a declaration that: (i) Magellan's existing data security measures do not comply with the requirements imposed upon it by law; and (ii) in order to comply with its legal obligations and duties of care, Magellan must implement and maintain reasonable security measures, including but not limited to, injunctive relief:

a. Ordering that Magellan engage third-party security auditors/penetration testers as well as internal security personnel to

conduct testing, including simulated attacks, penetration tests, and audits on systems on a periodic basis, and ordering Magellan to promptly correct any problems or issues detected by such third-party security auditors;

b.   Ordering that Magellan engage third-party security auditors and internal personnel to run automated security monitoring;

c.   Ordering that Magellan audit, test and train its security personnel regarding any new or modified procedures;

d.   Ordering that Magellan segment PII and PHI by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Magellan's systems;

e.   Ordering that Magellan purge, delete and destroy PII and PHI not necessary for its provisions of services in a reasonably secure manner;

f.   Ordering that Magellan conduct regular database scans and security checks;

g.   Ordering that Magellan routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.   Ordering Magellan to meaningfully educate its members and their beneficiaries about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they should take to protect themselves.

145.   Absent injunctive and declaratory relief, Plaintiff and Class Members' PHI and PII, which Defendants possess, continues to be at risk of further breaches.

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests the following relief:

a. An Order certifying this case as a class action;

b. An Order appointing Plaintiff as the class representative;

c. An Order appointing undersigned counsel as class counsel;

d. An Order compelling Defendants to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them or, alternatively, compelling Defendants to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services;

e. A mandatory injunction directing the Defendants to hereinafter adequately safeguard the PHI and PII of Plaintiff and the Class by implementing improved security procedures and measures;

f. An award of damages;

g. An award of costs and expenses;

h. An award of attorneys' fees; and

i. Such other and further relief as this court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial as to all issues triable by a jury.

DATED this 17th day of April 2020.

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
By *Carrie A. Laliberte*

Carrie A. Laliberte (AZ Bar #032556)
Elaine A. Ryan (AZ Bar #012870)
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:    (602) 274-1100
eryan@bffb.com
claliberte@bffb.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Patricia N. Syverson (AZ Bar #020191)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:     (619) 798-4593
psyverson@bffb.com

As local counsel for:

John A. Yanchunis*
Patrick A. Barthle*
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone:  (813) 223-5505
jyanchunis@forthepeople.com
pbarthle@forthepeople.com

Joel R. Rhine*
Martin A. Ramey*
Chris B. Barbour*
RHINE LAW FIRM, P.C.
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Telephone:  (910) 772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com

Counsel for Plaintiff and the Putative
Class

*Motions for *pro hac vice* admission
to be filed